**Exhibit A**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

_____

DERECK CASE, individually,
and as representative of a Class of
Participants and Beneficiaries of the
Generac Power Systems, Inc.
Employees 401(k) Savings Plan,

        Plaintiff,                                Case No. 21-cv-1100-PP

        v.

GENERAC POWER SYSTEMS, INC.,
BOARD OF DIRECTORS OF GENERAC
POWER SYSTEMS, INC.

        Defendants

_____

## SECOND AMENDED COMPLAINT

_____

Plaintiff, Dereck Case, individually and as representative of a Class of Participants and Beneficiaries on behalf of the Generac Power Systems, Inc. Employee 401(k) Savings Plan (the "Plan"), by his counsel, WALCHESKE & LUZI, LLC, as and for a claim against Defendants, alleges and asserts to the best of his knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, the following:

### <u>INTRODUCTION</u>

1. Plaintiff is a "participant" in a defined-contribution plan under ERISA Section 3(7), <u>29 U.S.C. § 1002(7)</u>: the Generac Power Systems, Inc. Employee 401(k) Savings Plan (the "Plan" or "Generac Plan").

2.      The Plan is a Section 401(k) "defined contribution" pension plan under 29 U.S.C. § 1002(34), meaning that Generac Power Systems Inc.'s ("Generac's") contributions to the payment of Plan costs is guaranteed but the pension benefits are not. In a defined contribution plan, the value of participants' investments is "determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l,* 575 U.S. 5, 525 (2015)

3.      As a defined-contribution plan, the Plan allows participants to direct the investment of their contributions, but the investment options included in the Plan are selected by the Plans' fiduciary.

4.      Generac, as the employer, is the administrator and fiduciary of the Plan. Generac assigned fiduciary administrative duties to its Benefit Plan Committee, and to their members.

5.      Plaintiff alleges two ERISA violations against Defendants: a violation of the duty of prudence under 29 U.S.C. § 1104(a)(1) for charging excessive bundled recordkeeping and administrative ("RKA") fees, and a claim against Generac and its Board of Directors for failure to monitor fiduciaries with regard to Plan Bundled RKA fees.

6.      Count I alleges a breach of fiduciary duty by Defendants for incurring unreasonable Bundled RKA fees. Among other things, Defendants paid a 73% premium per-participant for Bundled RKA fees for the Plan to the Plan recordkeepers, Transamerica. Defendants should have lowered its Bundled RKA expenses by soliciting bids from competing providers and using its large size and correspondent bargaining power of the Plan to negotiate for fee rebates.

7.       Counts II alleges a breach of fiduciary duty by Generac and its Board for failing to monitor those employees it appointed to be responsible for paying unreasonable Bundled RKA fees.

8.       Under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, plan fiduciaries must discharge their duty of prudence "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and

familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).

9. "In determining the contours of an ERISA fiduciary's duty, courts often must look to the law of trusts." *Tibble*, 575 U.S. at 528–29. The Supreme Court has stated that "a trustee has a continuing duty to monitor trust investments and remove imprudent ones ... separate and apart from the trustee's duty to exercise prudence in selecting investments at the outset." *Id.* at 529. "If the fiduciaries fail to remove an imprudent investment from the plan within a reasonable time, they breach their duty." *Hughes*, 142 S. Ct. at 742 (citing *Tibble*, 575 U.S. at 529–30). This continuing duty to monitor is a subset of the duty of prudence, *Tibble*, 575 U.S. at 529–30; *Hughes v. Northwestern Univ.*, 2023 WL 2607921, at *6 (7th Cir. Mar. 23, 2023) ("*Hughes II*")

10. The duty of prudence requires a plan fiduciary to "incur only costs that are reasonable in amount and appropriate to the investment responsibilities of the trusteeship." *Tibble*, 843 F.3d at 1197 (quoting RESTATEMENT (THIRD) OF TRUSTS § 90(c)(3*))*. "Expenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan." *Tibble*, 575 U.S. at 525.

11. Plan fiduciaries have a continuing duty to monitor their expenses to make sure that they are not excessive with respect to the services received. *See Tibble v. Edison Int'l*, 843 F.3d 1187, 1197 (9th Cir. 2016) ("[A] trustee is to 'incur only costs that are reasonable in amount and appropriate to the investment responsibilities of the trusteeship.'") (quoting RESTATEMENT (THIRD) OF TRUSTS § 90(c)(3))); *Tibble*, 575 U.S. at 525.

12. Although "a fiduciary need not constantly solicit quotes for recordkeeping services to comply with its duty of prudence, . . . fiduciaries who fail to monitor the reasonableness of plan fees and fail to take action to mitigate excessive fees—such as by adjusting fee arrangements, soliciting

bids, consolidating recordkeepers, negotiating for rebates with existing recordkeepers, or other means—may violate their duty of prudence." *Hughes II*, 2023 WL 2607921, at *5.

13. Defendants Generac Power Systems, Inc. ("Generac") and the Board of Directors of Generac Power Systems, Inc. ("Board Defendants") (collectively, "Defendants"), are ERISA fiduciaries as they exercise discretionary authority or discretionary control over the 401(k) defined contribution pension plan - known as the Generac Plan - that it sponsors and provides to its employees.

14. Plaintiff alleges that during the putative Class Period (June 8, 2015 through the date of judgment), Defendants, as fiduciaries of the Plan, as that term is defined under ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duty of prudence they owed to the Plan by requiring the Plan to "pay[ ] excessive recordkeeping [and administrative ('RKA')] fees," *Hughes*, 142 S. Ct. at 739-740, and by failing to remove their high-cost recordkeeper, Transamerica.

15. These objectively unreasonable RKA fees cannot be contextually justified, and do not fall within "the range of reasonable judgments a fiduciary may make based on her experience and expertise." *See Hughes*, 142 S. Ct. at 742.

16. The unreasonable Bundled RKA fees inferentially and plausibly establishes that an adequate investigation would have revealed to a reasonable fiduciary that the Plan Bundled RKA and investments, given their level and quality, were improvident. The facts alleged below show that a prudent fiduciary would have taken steps to reduce these Plan fees. *See Hughes II*, 2023 WL 2607921, at *8.

17. There is no requirement to allege the actual inappropriate fiduciary actions taken because "an ERISA plaintiff alleging breach of fiduciary duty does not need to plead details to which he has no access, as long as the facts alleged tell a plausible story." *Allen v. GreatBanc Tr. Co.*, 835 F.3d 670, 678 (7th Cir. 2016.)

18. There is no "obvious alternative explanation that suggests [that Defendants'] conduct falls within the range of reasonable judgments a fiduciary may make based on [their] experience and expertise." *Hughes II*, 2023 WL 2607921, at *8. Defendants' fiduciary decisions fall outside the range of reasonableness. *Id.* at *9.

19. These breaches of fiduciary duty caused Plaintiff and Class Members millions of dollars of harm in the form of lower retirement account balances than they otherwise should have had in the absence of these unreasonable Plan fees and expenses.

20. To remedy these fiduciary breaches, Plaintiff brings this action on behalf of the Plan under 29 U.S.C. § 1132(a)(2) to enforce Defendants' liability under 29 U.S.C. § 1109(a), to make good to the Plan all losses resulting from these breaches.

## JURISDICTION AND VENUE

21. This Court has subject matter jurisdiction in this ERISA matter under 28 U.S.C. §1331 and pursuant to 29 U.S.C. §1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. §1001 et seq.

22. This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and have significant contacts with this District, and because ERISA provides for nationwide service of process.

23. Venue is appropriate in this District within the meaning of 29 U.S.C. §1132(e)(2) because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. §1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within the District.

24. In conformity with 29 U.S.C. §1132(h), Plaintiff served the initial Complaint by certified mail on the Secretary of Labor and the Secretary of the Treasury.

## PARTIES

25.     Plaintiff, Dereck Case, is a resident of the State of Washington and currently resides in Arlington, Washington, and during the Class Period, was a participant in the Plan under 29 U.S.C. § 1002(7).

26.     Staring on February 11, 2017, Plaintiff worked from his home in Arlington, WA, as an Area Sales Manager for the Northwest Region of Generac Mobile Products, LLC, a wholly-owned subsidiary of Generac Power Systems, Inc. On January 1, 2021, his titled changed to Market Development Manager. His employment with Generac Mobile was terminated on May 11, 2021.

27.     During the Class Period, Plaintiff invested in the Vanguard Target Retirement 2035 Investment Fund. Plaintiff rolled his assets out of the Plan after institution of this lawsuit.

28.     Plaintiff has Article III standing to bring this action on behalf of the Plan because he suffered actual injuries to his Plan account through paying excessive Bundled RKA fees to Transamerica, those injuries are fairly traceable to Defendants' unlawful conduct in maintaining Transamerica as its recordkeeper, and the harm is likely to be redressed by a favorable judgment providing equitable relief to the Plaintiff and Class.

29.     Having established Article III standing, Plaintiff may seek recovery under 29 U.S.C. § 1132(a)(2), ERISA § 502(a)(2), on behalf of the Plan and for relief that sweeps beyond his own injuries.

30.     The Plaintiff and all participants in the Plan did not have knowledge of all material facts (including, among other things, the excessive recordkeeping and investment fees) necessary to understand that Defendants breached their fiduciary duties until shortly before this suit was filed.

31.     Having never managed a large 401(k) Plan, meaning a plan with around $250 million dollars or more in assets, *see Center for Retirement and Policy Studies, Retirement Plan Landscape Report* 18 (March 2022) ("Large plans have between $250 million and $500 million in assets,") Plaintiff, and all participants in the Plan, lacked actual knowledge of reasonable fee levels available to the Plan.

32.     Generac Power Systems, Inc. ("Generac") manufactures power products, including portable, residential, commercial, and industrial generators. Generac Mobile Products, LLC, a wholly-owned subsidiary of Generac, manufactures mobile equipment, including light towers, natural gas and diesel generators, water trailers, trash pumps, heaters, and dust suppression solutions. Generac is located at S45W29290 State Rd 59, Waukesha, WI 53189-9071.

33.     Generac Mobile is located at 215 Power Dr., Berlin, WI 54923-2420. In this Complaint, "Generac" refers to the named defendant and all parent, subsidiary (including Generac Mobile), related, predecessor, and successor entities to which these allegations pertain.

34.     Generac acted through its officers, including the Board Defendants, and their members to perform Plan-related fiduciary functions in the course and scope of their business. Generac appointed other Plan fiduciaries, and accordingly had a concomitant fiduciary duty to monitor and supervise those appointees.  For these reasons, Generac is a fiduciary of the Plan, within the meaning of 29 U.S.C. § 1002(21)(A).

35.     Generac is both the Plan sponsor and the Plan Administrator of the Generac Power Systems, Inc. Employees 401(k) Savings Plan. As the Plan Administrator, Generac is a fiduciary with day-to-day administration and operation of the Plan under 29 U.S.C. § 1002(21)(A). It has authority and responsibility for the control, management, and administration of the Plan in accord with 29 U.S.C. § 1102(a). Generac has exclusive responsibility and complete discretionary authority to control the operation, management, and administration of the Plan, with all powers necessary to properly carry out such responsibilities.

36.     The Plan has about $253,083,352 in assets entrusted to the care of the Plan's fiduciaries. The Plan had substantial bargaining power regarding the fees and expenses that were charged against participants' investments. Defendants, however, did not sufficiently attempt to reduce

the Plan's expenses or exercise appropriate judgment to monitor each investment option to ensure it was a prudent choice.

37. With 6,953 participants in 2021, the Plan had more participants than 99.76% of the defined contribution Plans in the United States that filed 5500 forms for the 2021 Plan year. Similarly, with $253,083,352 in assets in 2021, the Plan had more assets than 99.41% of the defined contribution Plans in the United States that filed 5500 forms for the 2021 Plan year.

## ERISA'S FIDUCIARY STANDARDS IN THE DEFINED CONTRIBUTION INDUSTRY

38. Employers must: (1) establish a prudent process for selecting service providers; (2) ensure that fees paid to service providers are reasonable in light of the level and quality of services provided; and (3) monitor service providers once selected to make sure they continue to be prudent choices.

### Recordkeeping and Administrative (RKA) Services

39. Defined contribution plan fiduciaries of large 401(k) plans hire service providers to deliver a retirement plan benefit to their employees. There is a group of national retirement plan services providers commonly and generically referred to as "recordkeepers," that have developed bundled service offerings that can meet all the needs of large retirement plans with a prudent and materially identical level and caliber of services. Transamerica is one such recordkeeper.

40. There are numerous recordkeepers in the marketplace who are *equally* capable of providing a high level of service to large defined contribution plans like the Generac Plan.

41. All else being equal, the more participants a plan has, a recordkeeper will be able to provide a lower fee per participant to provide materially identical RKA services to maintain the same profit margin rate.

42. There are three types of RKA services provided by all recordkeepers.

43. The first type, "Bundled RKA" services, include:

a. Recordkeeping;

b. Transaction Processing (which includes the technology to process purchases and sales of participants' assets as well as providing the participants the access to investment options selected by the plan sponsor);

c. Administrative Services related to converting a plan from one recordkeeper to another recordkeeper;

d. Participant communications (including employee meetings, call centers/phone support, voice response systems, web account access, and the preparation of other communications to participants, e.g., Summary Plan descriptions and other participant materials);

e. Maintenance of an employer stock fund;

f. Plan Document Services which include updates to standard plan documents to ensure compliance with new regulatory and legal requirements;

g. Plan consulting services including assistance in selecting the investments offered to participants;

h. Accounting and audit services including the preparation of annual reports, e.g., Form 5500;

i. Compliance support which would include, e.g., assistance interpreting plan provisions and ensuring the operation of the plan follows legal requirements and the provisions of the plan;

j. Compliance testing to ensure the plan complies with Internal Revenue nondiscrimination rules; and

k. Trustee / custodian services.

44. According to the May 4, 2021 Participant Fee Disclosure provided to the Plaintiff by Transamerica, the Plan's Bundled RKA fees include: "general administrative fees for ongoing plan administrative services (e.g., recordkeeping) of up to 0.17% annually of assets held in the plan

investment options . . . . [and a] general administrative fee of 0.02% will be deducted as a percentage of assets from some or all investment options held in your account." *Id.,* at F3.

45. General administrative fees cover the following Plan services provided by Transamerica: plan design services, plan document services, plan setup, administration and annual reporting services, communication materials distributed to plan participants, convenient access to participant records online via the web or by voice response unit or by phone, information-gathering and reporting services for investment options, transaction processing, calculation of the interest credited to the stable value contract and other allocation services, trust services, comprehensive recordkeeping, periodic reporting of plan assets and plan activity, web-based reporting capabilities, enrollment support and educational services, relationship management services, and other administrative services required to oversee and maintain the retirement plan.

46. In other words, the Plan provided participants all the commoditized Bundled RKA services provided to all other large 401(k) plan participants. The quality or type of RKA services provided by competitor recordkeepers are comparable to that provided by Transamerica.

47. Since well before 2015, industry experts have maintained that for large retirement plans like the Generac Plan, prudent fiduciaries treat Bundled RKA services as a commodity with little variation in price. "Custody and recordkeeping are 'commodity' services. Like any commodity, given equal quality, the key benchmark for these services is price. The cheaper you can find competent custody and recordkeeping services, the better for participants." Eric Droblyen, *Evaluating 401(k) Providers: Separating Commodity from Value-Added Services*, https://www.employeefiduciary.com/blog/evaluating-401k-providers-separating-commodity-value-added-services (Feb. 10, 2015).

48. Because RKA services are commoditized, recordkeepers primarily differentiate themselves based on price, and will aggressively bid to offer the best price in an effort to win the business, particularly for large plans like the Plan.

49. Bundled RKA services are essentially fungible and the market for them is highly competitive. This highly competitive RKA market is filled with equally capable recordkeepers who can provide comparable services for less.

50. The second type of essential RKA services, hereafter referred to as "A La Carte services," provided by all recordkeepers, often have separate, additional fees based on the conduct of individual participants and the usage of the service by individual participants (usage fees). These "A La Carte RKA" services typically include the following:

      a.      Loan processing;

      b.      Brokerage services/account maintenance;

      c.      Distribution services; and

      d.      Processing of Qualified Domestic Relations Orders (QDROs).

51. The May 4, 2021 Participant Fee Disclosure provided to the Plaintiff by Transamerica, the Plan provided all such standard A La Carte usage services as other similar large 401(k) plans do.

52. The third type of RKA fees are "Ad Hoc" fees which are transaction fees and other administrative fees, and include such things as ESOP fees, fees for service, and terminated maintenance fees.

53. According to the May 4, 2021 Participant Fee Disclosure provided to the Plaintiff by Transamerica, the Plan paid all the Ad Hoc RKA fees set out above and just like other comparable large plans do.

54. The sum of the Bundled RKA fees, A La Carte RKA fees, and Ad Hoc RKA fees equals the Total RKA fees.

55. Because the RKA offerings are fungible among all recordkeepers who provide services to large plans, like the Generac plan, it is the standard and prevailing practice for retirement plan consultants and advisors to request quotes by asking what the recordkeeper's "revenue requirement" is on a per participant basis for providing the Bundled RKA services.

56. In most cases, differences in fee rates for the A La Carte and Ad Hoc services are immaterial in determining the total fees charged by recordkeepers.

57. Retirement plan consultant and advisors primarily use the Bundled RKA fee rate of different recordkeepers to make fee rate comparisons and determine whether the Bundled RKA fee rate is reasonable.

58. This approach is validated by the structure of the RFPs sent out by retirement plan consultants and advisors and the responses provided by the recordkeepers and then the summary of the evaluations created by the retirement plan consultants and advisors.

59. Fidelity, the largest 401k recordkeeper in the country, has conceded that the RKA services that it provides to large Plans are commodified, including the plan services provided to its own employees.

60. As part of stipulated facts in a previous case, Fidelity stated: "The value of the recordkeeping services that Fidelity provided to the Plan in 2014 was $21 per participant; the value of the recordkeeping services that Fidelity provided to the Plan in 2015 and 2016 was $17 per participant, per year, and the value of the recordkeeping services that Fidelity has provided to the Plan since January 1, 2017 is $14 per participant, per year. Had the Plan been a third-party plan that negotiated a fixed fee for recordkeeping services at arm's length with Fidelity it could have obtained recordkeeping services for these amounts during these periods. The Plan did not receive any broader or more valuable recordkeeping services from Fidelity than the services received by any other Fidelity-recordkept plan with at least $1 billion in assets during the Class Period (November 18, 2014 to the present)." See

*Moitoso v. FMR LLC, et al.*, 1:18-CV-12122-WGY, Stipulation of Facts, Dkt. 128-67, at 4-5 (D. Mass. Sep. 6, 2019) (emphasis added).

61. By the start of, and during the entire Class Period, the level of fees that recordkeepers have been willing to accept for providing Bundled RKA has stabilized, and has not materially changed for large plans, including the Generac Plan. Reasonable Bundled RKA fees paid throughout the Class Period are representative of the reasonable fees during the entire Class Period. *See The Economics of Providing 401(k) Plans: Services, Fees, and Expenses, 2020*, ICI Research Perspective, at 4 (June 2021).

62. The investment options selected by plan fiduciaries often have a portion of the total expense ratio allocated to the provision of recordkeeping performed by the recordkeepers on behalf of the investment manager.

63. According to the May 4, 2021 Participant Fee Disclosure provided to the Plaintiff by Transamerica, "[i]f the revenue from an investment option is not adequate to cover the administrative fees allocable to that investment option, the shortfall will be deducted from your account based on your assets held in that investment option." *Id.* at F3.

64. Recordkeepers often collect a portion of the total expense ratio fee of the mutual fund in exchange for providing services that would otherwise have to be provided by the mutual fund. These fees are known as "revenue sharing" or "indirect compensation."

65. The Generac Plan and Plaintiff paid both direct and indirect Bundled RKA fees during the Class Period to Transamerica.

## STANDARD OF CARE FOR PRUDENT FIDUCIARIES SELECTING & MONITORING RECORDKEEPERS

66. Prudent plan fiduciaries ensure they are paying only reasonable fees for recordkeeping by engaging in an "independent evaluation," see *Hughes*, 142 S. Ct. at 742, and soliciting competitive bids from other recordkeepers to perform the same level and quality of services currently being provided to the Plan. *See, e.g.,* U.S. DEPARTMENT OF LABOR, *Understanding Retirement Plan Fees*

*and Expenses*, at 6, https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/understanding-retirement-plan-fees-and-expenses.pdf (last visited Oct. 10, 2022) ("Once you have a clear idea of your requirements, you are ready to begin receiving estimates from prospective providers. Give all of them complete and identical information about your plan and the features you want so that you can make a meaningful comparison. This information should include the number of plan participants and the amount of plan assets as of a specified date.")

67. Prudent plan fiduciaries can easily receive a quote from other recordkeepers to determine if their current level of recordkeeping fees is reasonable in light of the level and quality of recordkeeper fees. It is not a cumbersome or expensive process.

68. It is the standard of care prevailing among industry experts to solicit competitive bids every three to five years. *See* CAPTRUST, *Understanding and Evaluating Retirement Plan Fees | Part One: A Holistic Approach*, https://www.captrust.com/understanding-and-evaluating-retirement-plan-fees-part-one-a-holistic-approach/ (stating "best practice is . . . a more formal recordkeeper search and selection process conducted approximately every three to five years. Recordkeeping and administrative fees should be evaluated and compared to plans of similar size and type that are receiving analogous services. While each plan is unique—making an apples-to-apples comparison imperfect—evaluating fees against similarly situated and sized plans provides a good reference point in helping to determine if plan fees are reasonable.").

69. Having received bids, prudent plan fiduciaries can negotiate with their current recordkeeper for a lower fee or move to a new recordkeeper to provide a materially identical level and qualities of services for a more competitive reasonable fee if necessary.

70. A benchmarking survey alone is inadequate. Such surveys skew to higher "average prices," that favor inflated recordkeeping fees. To receive a truly "reasonable" recordkeeping fee in

the prevailing market, prudent plan fiduciaries engage in solicitations of competitive bids on a regular basis.

71. Prudent fiduciaries implement three related processes to prudently manage and control a plan's recordkeeping costs. *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014).

72. First, a hypothetical prudent fiduciary tracks the recordkeeper's expenses by demanding documents that summarize and contextualize the recordkeeper's compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and standalone pricing reports.

73. Second, to make an informed evaluation as to whether a recordkeeper is receiving no more than a reasonable fee for the quality and level of services provided to a plan, prudent hypothetical fiduciaries must identify all fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper.

74. Third, a hypothetical plan fiduciary must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available. By soliciting bids from other recordkeepers, a prudent plan fiduciary can quickly and easily gain an understanding of the current market for the same level and quality of recordkeeping services.

75. Accordingly, the best way to determine the *reasonable*, as opposed to the *cheapest* or *average*, market price for a given quality and level of RKA services is to obtain competitive bids from other providers in the market. *Hughes II*, 2023 WL 2607921, at *5 (although "a fiduciary need not constantly solicit quotes for recordkeeping services to comply with its duty of prudence, . . . fiduciaries who fail to monitor the reasonableness of plan fees and fail to take action to mitigate excessive fees—such as by adjusting fee arrangements, soliciting bids, consolidating recordkeepers, negotiating for rebates with existing recordkeepers, or other means—may violate their duty of prudence.").

## THE PLAN PAID UNREASONABLE BUNDLED RKA FEES TO TRANSAMERICA

76. A plan fiduciary must continuously monitor its RKA fees by regularly conducting an independent evaluation of those fee to ensure they are reasonable and remove recordkeepers if those fees are unreasonable. *See Hughes*, 142 S. Ct. at 742.

77. During the Class Period, Defendants failed to regularly monitor the Plan's Bundled RK&A fees paid to Transamerica.

78. During the Class Period, Defendants failed to regularly solicit quotes and/or competitive bids from recordkeepers, including but not limited to Transamerica, in order to avoid paying unreasonable Bundled RK&A fees.

79. During the Class Period, and unlike a hypothetical prudent fiduciary, Defendants followed a fiduciary process that was ineffective given the objectively unreasonable Bundled RKA fees it paid to Transamerica and in light of the level and quality of RKA services it received that were materially similar to services available through other recordkeepers and provided to other large plans.

80. As set forth in the table below, from the years 2015 through 2022, based upon information provided by the Plan fiduciaries to Plan participants in the 404(a)(5) Participant Fee Disclosures, the Plan paid an effective average annual Bundled RKA fee of $85 per participant.

### Bundled Recordkeeping and Administration (Bundled RKA) Fees

| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | *Average* |
|---|---|---|---|---|---|---|---|---|---|
| **Participants** | 1,744 | 1,713 | 3,236 | 3,675 | 4,034 | 5,000 | 6,953 | 6,953 | *4,164* |
| **Est. Bundled RKA Fees** | $189,441 | $226,707 | $383,156 | $344,957 | $474,708 | $362,536 | $429,842 | $429,842 | *$355,149* |
| **Est. Bundled RKA Per Participant** | $109 | $132 | $118 | $94 | $118 | $73 | $62 | $62 | *$85* |

81. These calculations are based on the Bundled RKA rates reportedly paid to Transamerica in the Section 404(a)(5) Participant Fee Disclosures as "administrative fees."

82. Defendants did not replace Transamerica during the Class Period. Indeed, going back to at least 2012, Defendants used Transamerica's predecessor, Diversified Retirement Corporation,

so that Transamerica/Diversified had been charging objectively unreasonable fees for Bundled RK&A services to the Generac Plan for at least ten years.

83.     The table below illustrates the annual Bundled RKA fees paid by other comparable plans of similar large sizes with similar amounts of money under management, receiving a materially identical level and quality of Bundled RKA services (that all large or large plans receive from recordkeepers), compared to the average annual Bundled RKA fees paid by the Plan (as identified in the table above):

**Comparable Plans' Bundled RKA Fees Based on Publicly Available Information from Participant Fee Disclosures or Financial Statements**

| Plan | Participants | Assets | Bundled RKA Fee ($) | Bundled RKA Fee ($/pp) | Recordkeeper |
|---|---|---|---|---|---|
| Beazer Homes USA, Inc. 401(K) Plan | 2,075 | $163,968,588 | $155,625 | $75 | Fidelity |
| Verso Retirement Savings Plan for Bargained Employees | 2,210 | $346,192,939 | $114,920 | $29 | Transamerica |
| MB Financial, Inc. 401 (K) Profit Sharing Plan | 3,102 | $397,165,192 | $214,038 | $69 | Vanguard |
| Doosan 401(K) Plan | 4,050 | $425,808,965 | $279,450 | $69 | Fidelity |
| Dana Retirement Savings Plan | 4,719 | $835,395,545 | $198,198 | $42 | Vanguard |
| Komatsu Mining Corp. Retirement Savings Plan | 5,235 | $812,598,602 | $256,515 | $49 | Fidelity |
| Bunzl USA, LLC Deferred Savings Plan | 6,657 | $836,504,771 | $319,536 | $48 | Vanguard |
| Kirkland & Ellis LLP Defined Contribution 401(K) Savings Plan | 7,248 | $2,178,918,909 | $333,408 | $46 | Vanguard |

| | | | | | |
|---|---|---|---|---|---|
| Snap-On Incorporated 401K Savings Plan | 8,153 | $917,548,431 | $358,732 | $44 | T. Rowe Price |
| Cornerstone Building Brands 401(K) Profit Sharing Plan | 9,384 | $668,389,740 | $403,512 | $43 | Fidelity |

84. The comparator Plans serviced by other recordkeepers and who charged less received materially the same level and quality of RKA services given that these services are fungible and commodified for large Plan like the Generac Plan. Indeed, each of these Plans note in their fee disclosures that they received Bundled RKA services just like the Generac Plan in the form of recordkeeping, trustee, and other administrative services.

85. The graph below illustrates the Average Bundled RKA Fee Comparison during different periods of time during the Class Period between the Generac Plan and comparably-sized large Plans receiving materially identical Bundled RKA during the same time period, with the white data points representing Bundled RKA fees that recordkeepers offered to (and were accepted by) comparable Plans:



86. The graph below illustrates the Average Bundled RKA Fee Comparison between the Generac Plan and comparably-sized large Plans receiving materially identical Bundled RKA during 2015-2022, with the white data points representing Bundled RKA fees that recordkeepers offered to (and were accepted by) comparable Plans:



87. The trend line (dashed white in the graph above) generated from these data points represent a reasonable estimate of the fee rate that several recordkeepers serving the large market would be willing to accept in a competitive environment to provide Bundled RKA services to the Plan.

88. During the Class Period, the graph above illustrates that the Plan paid an effective annual Bundled RKA fee of $85 per participant.

89. A reasonable Bundled RKA fee for the Generac Plan based on the services provided by existing recordkeepers and the Plan's features, based on graph above, would have been $49 per participant.

90. The Bundled RKA fees paid by the Plan to Transamerica during the Class Period were excessive relative to the RKA services rendered. More specifically, a disparity of $49 per participant (over 73% premium) existed during the relevant time period compared to the average fee of $85 per participant over the relevant Class Period.

91. From the years 2015 through 2022 and based upon information derived from 404(a)(5) participant fee disclosure documents provided to participants in similarly sized plans, had Defendants been acting prudently, the Plan actually would have paid significantly less than an average of approximately $355,149 per year in Bundled RK&A fees, which equated to an effective average of approximately $85 per participant per year.

92. From the years 2015 through 2022, and based upon information derived from the 404(a)(5) participant fee disclosure documents provided to participants in similarly sized plans, as compared to other Plans of similar sizes receiving a materially identical level and quality of Bundled RKA services, had Defendants been acting prudently, the Plan actually would have paid on average a reasonable effective annual market rate for Bundled RKA of approximately $204,036 per year, which equates to approximately $49 per participant per year. During the entirety of the Class Period, a hypothetical prudent plan fiduciary would not agree to pay *a 73% premium* for what they could otherwise pay for the materially identical level and quality of Bundled RKA services.

93. From the years 2015 through 2022 and based upon information derived from 404(a)(5) participant fee disclosures, the Plan additionally cost its participants on average approximately $149,670 per year in unreasonable and excessive Bundle RKA fees, which equates to, on average, approximately $36 per participant per year.

94. From the years 2015 to 2022, and because Defendants did not act with prudence, and as compared to other plans of similar sizes and with a materially identical level and quality of services, the Plan actually cost its participants a total minimum amount of approximately $1,197,363 in unreasonable and excessive Bundled RK&A fees.

95. From the years 2014 to 2022, based upon information derived from 404(a)(5) participant fee disclosures, because Defendants did not act prudently, and as compared to other Plans of similar sizes and with a materially identical level and quality of services, the Plan caused Plan

participants to suffer losses (when accounting for compounding percentages/lost market investment opportunity) a total cumulative amount in excess of $1,984,622 in Bundled RKA fees.

96.     Defendants could have received Bundled RKA services during the Class Period of the same level and quality from Transamerica or other recordkeepers that provide Bundled RKA services to large plans, like the Generac Plan, because the Plan fee disclosures establish that the Plan received no services that were materially different than the services received by all the comparable plans in the chart above.

97.     Although the United States Supreme Court noted in *Hughes* that "[a]t times, the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs, and courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise," *Hughes*, 142 S. Ct. at 742, no reasonable tradeoffs existed here because recordkeepers for large plans, like the one here, are providing the materially same level and quality of commoditized services.

98.     Defendants failed to take advantage of the Plan's enormous size to timely negotiate lower fees from its existing recordkeepers, Transamerica, and Defendants could have obtained the same Bundled RKA services for less from other recordkeepers or from Transamerica itself if had only used it large size and leverage.

99.     Defendants did not conduct effective or competitive bidding for Bundled RKA services and failed to use the Plans' large size to negotiate rebates from Transamerica.

100.    Plaintiff paid these excessive Bundled RKA fees in the form of direct and indirect compensation to the Plan and suffered injuries to his Plan accounts as a result.

101.    Plaintiff has participated in several other large 401(k) plans from other employers and there have been no material differences in the services that he has received.

102. During the entirety of the Class Period, and had Defendants engaged in regular and/or reasonable examination and competitive comparison of the Bundled RKA fees it paid to Transamerica, it would have realized that the Plan was compensating Transamerica unreasonably and inappropriately for its size and scale, passing these objectively unreasonable and excessive fee burdens to Plaintiff and Plan participants, and therefore should have removed Transamerica as the Plan recordkeeper.

103. During the entirety of the Class Period and by failing to recognize that the Plan and its participants were being charged much higher Bundled RKA fees than they should have been and/or by failing to take effective remedial actions including removing Transamerica as the Plan recordkeeper, Defendants breached their fiduciary duty of prudence to Plaintiff and Plan participants, causing millions of dollars of harm to Plaintiff and Class Member's retirement accounts.

**CLASS ACTION ALLEGATIONS**

104. 29 U.S.C. §1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. §1109(a).

105. In acting in this representative capacity, Plaintiff seeks to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiff seeks to certify, and to be appointed as representatives of, the following Class:

> All participants and beneficiaries of the Generac Power Systems, Inc. Employees 401(k) Savings Plan (excluding the Defendants or any participant/beneficiary who is a fiduciary to the Plan) beginning June 8, 2015 and running through the date of judgment.

106. The Class includes almost 7,000 members and is so large that joinder of all its members is impracticable, pursuant to Federal Rule of Civil Procedure 23(a)(1).

107. There are questions of law and fact common to this Class pursuant to Federal Rule of Civil Procedure 23(a)(2), because Defendants owed fiduciary duties to the Plan and took the actions

and omissions alleged as the Plan and not as to any individual participant. Common questions of law and fact include but are not limited to the following:

- Whether Defendants are fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a);

- Whether Defendants breached their fiduciary duties to the Plan;

- What are the losses to the Plan resulting from each breach of fiduciary duty; and

- What Plan-wide equitable and other relief the Court should impose in light of Defendants' breach of duty.

108. Plaintiff's claims are typical of the claims of the Class pursuant to Federal Rule of Civil Procedure 23(a)(3), because Plaintiff was a participant during the time period at issue and all participants in the Plan were harmed by Defendants' misconduct.

109. Plaintiff will adequately represent the Class pursuant to Federal Rule of Civil Procedure 23(a)(4), because they are participants in the Plan during the Class period, have no interest that conflicts with the Class, are committed to the vigorous representation of the Class, and have engaged experienced and competent lawyers to represent the Class.

110. Certification is appropriate under Federal Rule of Civil Procedure 23(b)(1), because prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (1) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendant concerning its discharge of fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. § 1109(a), and (2) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries who are not parties to the adjudication, or would substantially impair those participants' and beneficiaries' ability to protect their interests.

111. Certification is also appropriate under <u>Federal Rule of Civil Procedure 23(b)(2)</u> because Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

112. Plaintiff's attorney is experienced in complex ERISA and class litigation and will adequately represent the Class.

**FIRST CLAIM FOR RELIEF**
**Breach of Duty of Prudence under ERISA, as Amended**
**<u>(Plaintiff, on behalf of himself and Class against Defendants – RK&A Fees)</u>**

113. Plaintiff restates the above allegations as if fully set forth herein.

114. Defendants are fiduciaries of the Plan under <u>29 U.S.C. §§1002(21)</u> and/or 1102(a)(1).

115. <u>29 U.S.C. §1104</u> imposes fiduciary duties of prudence upon Defendants in their administration of the Plan.

116. Defendants, as fiduciaries of the Plan, are responsible for selecting a recordkeeper that charges reasonable RK&A fees.

117. During the Class Period, Defendants had a fiduciary duty to do all of the following: ensure that the Plan's RK&A fees were reasonable; defray reasonable expenses of administering the Plan; and act with the care, skill, diligence, and prudence required by ERISA.

118. During the Class Period, Defendants breached their fiduciary duties of prudence to Plan Participants, including Plaintiff, by failing to: ensure that the Plan's RK&A fees were reasonable, defray reasonable expenses of administering the Plan, and act with the care, skill, diligence, and prudence required by ERISA.

119. During the Class Period, Defendants further had a continuing duty to regularly monitor and evaluate the Plan's recordkeeper to make sure it was providing the contracted services at reasonable costs, given the highly competitive market surrounding recordkeeping services and the significant bargaining power the Plan had to negotiate the best fees.

120. During the Class Period, Defendants breached their duty to Plan participants, including Plaintiff, by failing to employ a prudent process by failing to evaluate the cost and performance of the Plan's recordkeeper critically or objectively in comparison to other substantially similar recordkeeping options.

121. Defendants' failure to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, breaching its duties under 29 U.S.C. §1104(a)(1)(B).

122. As a result of Defendants' breach of fiduciary duty of prudence with respect to the Plan, the Plaintiff and Plan participants suffered objectively unreasonable and unnecessary monetary losses.

123. Defendants are liable under 29 U.S.C. §§1109(a) and 1132(a)(2) to make good to the Plan the losses resulting from the breaches, to restore to the Plan any profits defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count. In addition, Defendants are subject to other equitable relief pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2).

### SECONDA CLAIM FOR RELIEF
**Failure to Adequately Monitor Other Fiduciaries under ERISA, as Amended**
**(Plaintiff, on behalf of himself and Class against**
**Defendants Generac and Board – RK&A Fees)**

124. Plaintiff restates the above allegations as if fully set forth herein.

125. Defendants Generac and its Board had the authority to appoint and remove members or individuals on the Committee responsible for Plan RK&A fees and knew or should have known that these fiduciaries had critical responsibilities for the Plan.

126. In light of this authority, Defendants Generac and its Board had a duty to monitor those individuals responsible for Plan RK&A fees to ensure that they were adequately performing

their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

127. Defendants Generac and its Board had a duty to ensure that the individuals responsible for Plan administration possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to Defendants.

128. The objectively unreasonable and excessive recordkeeping fees paid by the Plan inferentially suggest that Defendants Generac and its Board breached their duty to monitor by, among other things:

    a.    Failing to monitor and evaluate the performance of individuals responsible for Plan recordkeeping fees on the Committee or have a system in place for doing so, standing idly by as the Plan suffered significant losses in the form of objectively unreasonably recordkeeping expenses;

    b.    Failing to monitor the process by which the Plan's recordkeeper was evaluated and failing to investigate the availability of more reasonably-priced recordkeepers; and

    c.    Failing to remove individuals responsible for Plan recordkeeping fees whose performance was inadequate in that these individuals continued to pay the same recordkeeping costs even though solicitation of competitive bids would have shown that maintaining Transamerica as recordkeeper at the contracted price was imprudent, excessively costly, all to the detriment of the Plan and Plan participants' retirement savings.

129. As the consequences of the breaches of the duty to monitor for recordkeeping fees the Plaintiff and Plan participants suffered millions of dollars of objectively unreasonable and unnecessary monetary losses.

130. Pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan all loses caused by their failure to adequately monitor individuals responsible for Plan

recordkeeping fees. In addition, Plaintiff is entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

**WHEREFORE**, Plaintiff prays that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A. A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative Rule 23(b)(2), of the Federal Rules of Civil Procedure;

B. Designation of Plaintiff as Class Representative and designation of Plaintiff's counsel as Class Counsel;

C. A Declaration the Defendants have breached their fiduciary duties under ERISA;

D. An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of fiduciary duty, including restoring to the Plan all losses resulting from imprudent investment of the Plan's assets, restoring to the Plan all profits the Defendants made through use of the Plan's assets, and restoring to the Plan all profits which the Participants would have made if the Defendants had fulfilled their fiduciary obligation;

E. An Order requiring Defendant Generac to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. §1132(a)(3) in the form of an accounting for profits, imposition of constructive trust, or surcharge against Generac as necessary to effectuate relief, and to prevent Generac' unjust enrichment;

F. An Order enjoining Defendants from any further violation of their ERISA fiduciary responsibilities, obligations, and duties;

G. Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan fiduciaries deemed to have breached their fiduciary duties;

H. An award of pre-judgment interest;

I. An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

J. Such other and further relief as the Court deems equitable and just.

Dated this 17th day of April, 2023

WALCHESKE & LUZI, LLC
Counsel for Plaintiff

**s/ *Paul M. Secunda***
James A. Walcheske, State Bar No. 1065635
Scott S. Luzi, State Bar No. 1067405
David M. Potteiger, State Bar No. 1067009
Paul M. Secunda, State Bar No. 1074127

WALCHESKE & LUZI, LLC
235 N. Executive Dr., Suite 240
Brookfield, Wisconsin 53005
Telephone: (262) 780-1953
Fax: (262) 565-6469
E-Mail: jwalcheske@walcheskeluzi.com
E-Mail: sluzi@walcheskeluzi.com
E-Mail: dpotteiger@walcheskeluzi.com
E-Mail: psecunda@walcheskeluzi.com